IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| MICHELLE L., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:17-CV-2796-BH |
| | § | |
| NANCY A. BERRYHILL, ACTING | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

By consent of the parties and the order of transfer dated December 28, 2017 (doc. 16), this case has been transferred for the conduct of all further proceedings and the entry of judgment. Based on the relevant filings, evidence, and applicable law, the Commissioner's decision is **AFFIRMED**.

### I. BACKGROUND

Michelle L. (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying her claim for supplemental security income (SSI) under Title XVI of the Social Security Act (Act). (*See* docs. 1; 17.)

**A.    Procedural History**

On September 3, 2013, Plaintiff filed her application for SSI, alleging disability beginning on January 20, 2008. (doc. 12-1 at 71.)[1]  Her claim was denied on April 4, 2014, and upon reconsideration on November 10, 2014. (*Id*. at 71, 86.) On December 18, 2014, she requested a

---

[1] Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

hearing before an Administrative Law Judge (ALJ). (*Id*. at 101.) She appeared and testified at a hearing on January 21, 2016. (*Id*. at 40-57.) On August 11, 2016, the ALJ issued a decision finding that she was not disabled and denying her claim for benefits. (*Id*. at 24-33.)

Plaintiff timely appealed the ALJ's decision to the Appeals Council on August 25, 2016. (*Id*. at 149.) The Appeals Council denied her request for review on August 14, 2017, making the ALJ's decision the final decision of the Commissioner. (*Id*. at 5.) Plaintiff timely appealed the Commissioner's decision under 42 U.S.C. § 405(g). (*See* doc. 1.)

**B.     Factual History**

    **1.     Age, Education, and Work Experience**

Plaintiff was born on November 28, 1969, and was 46 years old at the time of the hearing. (doc. 12-1 at 32, 46.) She had at least a high school education and could communicate in English. (*Id*. at 32.) She had no past relevant work experience. (*Id*.)

    **2.     Medical Evidence**

On September 10, 2013, Plaintiff went to the emergency room at the Baylor Medical Center at Garland with complaints of abdominal pain and chest pain. (*Id*. at 254.) She underwent a chest x-ray which showed no acute pulmonary abnormality. (*Id*. at 262.) An abdominal ultrasound was also performed, which showed that her gallbladder was not well distended, and there was sludge and small stones. (*Id*. at 274.)

On October 18, 2013, Plaintiff met with Brian Weber, P.A., in order to establish a primary care physician and refill her medications. (*Id*. at 454.) Plaintiff reported that she had two strokes in the previous year, and her memory, eyesight, and hearing had been affected. (*Id*.) Following an assessment, Mr. Weber found that she had benign essential hypertension, multiple sclerosis, and stroke syndrome. (*Id*.)

2

On January 17, 2014, Plaintiff had a book-in medical screening at the Collin County Sheriff's Office. (*Id*. at 466.) Based on self-reports, Plaintiff had early indications of possible mental illness. (*Id*. at 467.) She reported monthly methamphetamine use and had last used that week. (*Id*. at 471.) She was disorganized and could not recall what month it was, but she was alert to herself and place. (*Id*. at 472.) She often stared into space and struggled to answer questions without having them repeated. (*Id*.) It was noted that further assessment was necessary in order to determine if her symptoms were from the residual effects of substance use or indicative of another diagnosis. (*Id*.) She was diagnosed with methamphetamine dependence, and it was noted that she had previously been diagnosed with depression and anxiety. (*Id*.)

On February 24, 2014, Plaintiff saw Mr. Weber after she was involved in a motor vehicle accident. (*Id*. at 496-97.) She reported that she was diagnosed with strains/sprains in her neck, back, shoulder, and hip. (*Id*. at 497.) She claimed that work activities were restricted due to the accident, and that she occasionally had numbness in either of her legs that went up to her groin, causing her to fall. (*Id*.)

On March 6, 2014, Linda S. Ludden, Ed.D., completed a clinical interview and mental status examination for Plaintiff. (*Id*. at 485.) Plaintiff's posture and gait appeared normal, her hygiene was good, and her grooming was average. (*Id*.) She appeared alert throughout the interview and was cooperative in answering questions and tasks. (*Id*.) She reported that she had lupus, multiple sclerosis, kidney problems, endometriosis, "locked" bowels, two prior strokes, high blood pressure, and high cholesterol. (*Id*. at 485-86.) Her walking had been affected by her conditions. (*Id*. at 486.) She reported psychiatric inpatient hospitalizations, but could not provide specific dates or concrete reasons why she was hospitalized, and mental health symptoms of bipolar disorder, cognitive disorder, and anxiety. (*Id*. at 486-88.) Her thought process was logical and goal-directed, and she

denied having delusional thoughts, paranoid thoughts, hallucinations, suicidal ideation, or homicidal ideation. (*Id*. at 490.) Her mood was anxious and affect was appropriate to speech content. (*Id*.) She was oriented times 4, appeared to work from an adequate fund of knowledge, and her intelligence was estimated to be average. (*Id*.) Her remote memory and immediate memory were satisfactory, and her short-term memory was fair. (*Id*. at 491.) She had some difficulty with concentration but could spell "world" forward and backward, her insight was adequate, and her judgment was satisfactory. (*Id*.) Dr. Ludden diagnosed her with bipolar disorder, most recent episode manic; anxiety due to lupus, multiple sclerosis, and strokes; cognitive disorder, not otherwise specified; and nicotine dependence. (*Id*.) She had a Global Assessment of Functioning (GAF) score of 50, and her prognosis was guarded due to her apparent cognitive decline from her health conditions. (*Id*.) Dr. Ludden opined that Plaintiff would need assistance to be able to manage benefits on her own, but she did understand the meaning of filing for benefits. (*Id*. at 492.)

On March 8, 2014, Robert Evans Heithaus Jr., M.D., created a medical report for Plaintiff showing that she alleged disability due to stroke, multiple sclerosis, and lupus. (*Id*. at 477-83.) She reported a stroke in 2008, which primarily affected her right side and speech. (*Id*. at 477.) She did not have physical therapy following the stroke, and her symptoms included hearing problems, stiffness in her lower right extremity, and memory problems. (*Id*.) She claimed that it affected her ability to work, secondary to her difficulty standing, walking, and bending. (*Id*.) She also had a history of hypertension that was generally well controlled, and multiple sclerosis that caused her balance problems and pain. (*Id*.) Her symptoms from the multiple sclerosis were exacerbated by standing and walking and improved with sitting, and her pain was at about a 7-8 out of 10 on most days. (*Id*.) It affected her ability to work, secondary to difficulty grasping, standing, and walking. (*Id*.) She also reported a history of lupus which caused pain, swelling, weakness, and memory loss,

4

and her pain was at a 7-8 out of 10 on most days. (*Id*.) It affected her ability to work, secondary to difficulty standing and walking. (*Id*.) Plaintiff reported functional limitations of sitting 60 minutes, standing 10 minutes, walking short distances, and lifting and carrying 4 pounds frequently and 5 pounds occasionally due to pain. (*Id*. at 478-79.) Dr. Heithaus found that Plaintiff had bilateral lower extremity edema, an essentially normal neurologic exam, intact cranial nerves, good strength in her upper and lower extremities, intact proprioception and sensation to light touch, no concerning cerebellar symptomatology, and minimal difficulty performing gait exam maneuvers. (*Id*. at 482.) She provided her best effort during the examination. (*Id*.) Dr. Heithaus opined that Plaintiff could be expected to sit, stand, and walk normally in an 8-hour workday with normal breaks; she did not need an assistive device with regards to short and long distances and uneven terrain; she did not have significant limitations with lifting and/or carrying weight; she had no limitations on bending, stooping, crouching, or squatting and could perform them frequently; she had no manipulative limitations on reaching, handling, feeling, grasping, or fingering and could perform them frequently; she had no relative communicative or workplace environmental limitations; and she had some relevant visual limitations due to decreased visual acuity bilaterally without corrective lenses. (*Id*. at 482-83.)

On April 9, 2014, April 28, 2014, May 2, 2014, and May 8, 2014, Plaintiff met with Mr. Weber. (*Id*. at 552, 554, 557, 561.) At her first appointment, she complained that her lupus was flaring up, she had been falling more due to multiple sclerosis, and she had nasal congestion and cough. (*Id*. at 561.) She was assessed with asthma and systemic lupus erythematosus and was provided a cane. (*Id*. at 562.) Her second appointment was for a follow-up, and she complained of headaches and getting lost sometimes. (*Id*. at 557.) She was assessed with a urinary tract infection and headache syndromes. (*Id*. at 558.) She complained of ear pain bilaterally, requested to discuss

her medications, and appeared very fidgety at her third appointment. (*Id*. at 554.) Following examination, she was assessed with allergic rhinitis. (*Id*. at 555.) Her fourth appointment was a follow-up due to her prior systemic lupus erythematosus flare up. (*Id*. at 552.) She had previously gone to the emergency room because she was weak, could not move, and was hurting. (*Id*.) Physical findings were unremarkable, and she was assessed with systemic lupus erythematosus.

On July 24, 2014, Plaintiff went to Live Oak Professional Center (Live Oak) with complaints of swelling in her lower extremity, primarily in her right hip. (*Id*. at 549.) She was found to be overweight, agitated, speaking quickly, and fidgety. (*Id*. at 550.) She also had bilateral pedal and pretibial edema that was non-pitting. (*Id*.) She was prescribed medication for systemic lupus erythematosus. (*Id*.)

On August 11, 2014 and September 8, 2014, Plaintiff again met with Mr. Weber. (*Id*. at 540, 546.) She initially complained of left hip pain since the previous day. (*Id*. at 546.) She had hip tenderness on the right and was diagnosed with a hip sprain. (*Id*. at 547.) At her second appointment, she complained that she was emotional because she had been taken off of Hydrocodone and Xanax. (*Id*. at 540.) Physical findings were unremarkable, and she was assessed with chronic pain and depression. (*Id*. at 541.)

On August 25, 2014, Plaintiff returned to Live Oak complaining that she was not feeling well, not sleeping well at night, and feeling depressed. (*Id*. at 543.) She was assessed with hypertension, systemic lupus erythematosus, manic episode, and depression. (*Id*. at 544.)

On June 29, 2015, July 29, 2015, October 22, 2015, and November 23, 2015, Plaintiff met with Mr. Weber for treatment. (*Id*. at 619-26.) She initially complained of weight loss and a lack of appetite. (*Id*. at 624.) She had been arrested for possession of methamphetamine and fighting with her sister, and went to a homeless shelter. (*Id*.) She was "[w]orking on some type of rehab,"

still losing weight, had no abdominal pain, had trouble sleeping, and just sat at home and did not leave. (*Id.*) She was in a depressed mood and not talking much. (*Id.*) Following examination, she was assessed with depression. (*Id.* at 625.) At her follow-up in July, Plaintiff was doing better, more talkative, and reported that she would leave the house with her mother to go to the store. (*Id.* at 622.) She was assessed with severe recurrent major depression. (*Id.* at 623.) In October, it was noted that her active problems included multiple sclerosis and systemic lupus erythematosus. (*Id.* at 621.) At her follow-up in November, she was smiling more, but reported that she was still staying in bed most of the time. (*Id.* at 619.) Although she stayed in bed most of the time, she would get out of the house for short periods. (*Id.*) She had trouble falling asleep and sleeping most nights, and was taking Mirtazapine right at bed time. (*Id.*) She was again assessed with severe recurrent major depression. (*Id.* at 620.)

On January 11, 2016, Darrell Horton, Ph.D., completed a psychological evaluation for Plaintiff. (*Id.* at 678.) Dr. Horton noted that unless otherwise stated, all historical information in the report was based on self-reports from Plaintiff. (*Id.*) Her medications included an anti-depressant that was prescribed by Mr. Weber. (*Id.*) Plaintiff presented to her appointment in a quiet and withdrawn manner, and she was thin in stature and wore loose fitting clothing. (*Id.*) She often appeared sad or confused, but she was respectful to the examiner and cooperated within her capabilities. (*Id.* at 678-79.) Her affect was blunted and congruent with a dysphoric mood, speech was impoverished, and she frequently sat and stared off. (*Id.* at 679.) She related that she was scared to go out but she did not know why. (*Id.*) Dr. Horton found that Plaintiff was severely depressed and showed some cognitive slippage, particularly in regard to emotional and interpersonal matters. (*Id.* at 683-84.) He opined that her periodic estrangement from others could cause her to lose touch with reality on occasion. (*Id.* at 684.) Her social communication was often tangential,

7

odd, strained, and self-conscious, which further alienated her from others. (*Id.*) Her hesitation to express affect could have stemmed from an intrinsic inability to experience pleasure, and she seemed to have some cognitive interference, such as persistent intrusion of distracting and disruptive thoughts. (*Id.*) Her irrelevant and digressive ideation upset effective social communication. (*Id.*) Dr. Horton found that her prognosis for competitive employment was poor, and that she was not able to make reasonable adjustments in every day living, much less in a job situation. (*Id.*)

On April 18, 2016, Levi Armstrong, Psy. D., completed a Medical Source Statement of Ability to do Work-Related Activities (Mental) for Plaintiff. (*Id.* at 685-87.) He found that she had no limitations in her abilities to understand and remember simple instructions or complex instructions; mild limitations in her abilities to carry out simple instructions, complex instructions, or to make judgments on complex work-related decisions; and moderate limitations in her ability to make judgments on simple work-related decisions. (*Id.* at 685.) He found that Plaintiff had moderate limitations in her abilities to act appropriately with supervisors, coworkers, and the public, as well as respond to changes in a routine work setting. (*Id.* at 686.) He opined that Plaintiff's schizoaffective disorder, mood instability, and intermittent psychosis would likely preclude her from consistently interacting with people in an effective manner. (*Id.*) She would also have difficulty tolerating the normal pressures of a competitive work environment. (*Id.*) He determined that Plaintiff could manage benefits in her own best interest. (*Id.* at 687.)

### 3. Hearing Testimony

On January 21, 2016, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ. (*Id.* at 40-57.) Plaintiff was represented by an attorney. (*Id.* at 42.)

#### a. *Plaintiff's Testimony*

Plaintiff testified that she was 46 years old, had completed 10th grade, and was living with

her mom and step-dad. (*Id*. at 44.) There was not a particular reason why she did not live alone, but she did not think she could live alone because of her inability to do most things due to her mental and physical issues. (*Id*. at 45-46.) She thought that she probably had trouble with being able to process things that she needed to do from a mental standpoint. (*Id*. at 46.) Her mother usually kept "up with things" for her because she usually did not remember. (*Id*.) She prepared meals with her mother and helped to set the table and put dishes away. (*Id*. at 46-47.) Her mother also took her to doctor's appointments. (*Id*. at 50.)

She met with Mr. Weber about every 3 months, and although he had her on medication, she was still having problems doing "most things." (*Id*. at 47.) She was only on one medication, which was for depression, at the time of the hearing. (*Id*. at 49.) She also had problems from a physical standpoint; physical things were hurting her, but she did not really know what they were. (*Id*. at 48.) She did not go out shopping alone or go to the grocery store alone, but sometimes she went with her mom. (*Id*.) She did not think that she would be able to keep a job. (*Id*. at 49-50.) She did not remember if she had strokes in the past, but trusted the doctor's report that said they had happened. (*Id*. at 50.) She had last worked in 1999, but could not work anymore because she was sick a lot due to lupus or multiple sclerosis, and she also had emotional problems. (*Id*. at 50-51.) She was arrested in June of the previous year due to an argument with her sister, but she stated that she did not have any drugs when she was arrested, and she did not think she had any charges pending. (*Id*. at 52.)

### b. *VE's testimony*

The ALJ asked the VE to consider a hypothetical individual with the same age, education, and work experience as Plaintiff who suffered from a combination of physical pain as well as concentration problems from emotional factors, and whose main problem would be focusing on tasks consistently throughout an entire 8-hour workday for extended periods of time, defined as 2

hours at a time. (*Id*. at 55.) The ALJ asked if the individual would be able to perform any type of work, and the VE responded that she would not. (*Id*.)

The ALJ then asked the VE to consider a hypothetical individual who could sit for less than 6 hours in an 8-hour workday, and stand/walk for less than 2 hours out of an 8-hour workday. (*Id*.) The ALJ asked if he was correct that this individual would not be able to perform any work because those numbers were not competitive, and the VE responded that he was correct. (*Id*.)

The ALJ next asked the VE to consider a hypothetical of the same age, education, and work history as Plaintiff who could sit for 6 hours out of an 8-hour workday; stand and walk for 2 hours out of an 8-hour workday; lift 20 pounds occasionally and 10 pounds frequently; perform only simple 1-2 step work; and concentrate for extended periods of 2 hours at a time with no other mental limitations. (*Id*. at 55-56.) The individual would also have "occasional postural limitations." (*Id*. at 56.) The ALJ asked if the individual would be able to perform any type of work. (*Id*.) The VE responded that the individual could perform work as a price tagger, DOT 209.587-034 (light, SVP 2), with about 5,700 jobs in Texas and 190,000 jobs nationally; an office cleaner, DOT 323.687-014 (light, SVP 2), with about 11,000 jobs in Texas and 380,000 jobs nationally; and an assembler, DOT 739.687-030 (light, SVP 2), with about 6,800 jobs in Texas and 205,000 jobs nationally. (*Id*.) The ALJ did not ask the VE whether her testimony was consistent with the Dictionary of Occupational Titles (DOT). (*See id*.)

## C. ALJ's Findings

The ALJ issued his decision denying benefits on August 11, 2016. (*Id*. at 24-33.) At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since September 3, 2013, the application date. (*Id*. at 26.) At step two, the ALJ found that Plaintiff had the following severe impairments: lupus, multiple sclerosis, history of strokes, affective disorder, and anxiety-

10

related disorders. (*Id*.) Despite those impairments, at step three, the ALJ found that Plaintiff had no impairments or combination of impairments that met or equaled the severity of one of the impairments listed in the social security regulations. (*Id*.)

Next, the ALJ determined that Plaintiff retained the RFC to perform less than the full range of light work as defined in 20 C.F.R. § 416.967(b), with the following limitations: she could lift and/or carry 20 pounds occasionally, and 10 pounds frequently; stand and/or walk 2 hours out of an 8-hour workday; sit up to 6 hours in an 8-hour workday; perform simple 1-2 step task work; and concentrate for 2 hours at a time with no other mental limitations. (*Id*. at 27-28.) The ALJ also found that she had "occasional postural limitations." (*Id*. at 28.)

At step four, the ALJ determined that Plaintiff had no past relevant work experience. (*Id*. at 32.) At step five, the ALJ found that transferability of job skills was not an issue because Plaintiff did not have any past relevant work, but considering her age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that she could perform. (*Id*.) Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, since September 3, 2013, the date the application was filed. (*Id*. at 33.)

## II. LEGAL STANDARDS

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not

reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). The relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are also identical to those governing the determination under a claim for supplemental security income. *See id*. Courts may therefore rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id*.

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### III. ISSUES FOR REVIEW

Plaintiff presents one issue for review:

> The Administrative Law Judge (ALJ) erred in relying on the vocational expert's (VE) testimony to find that there are jobs existing in significant numbers in the national economy that Plaintiff . . . can perform.

(doc. 17 at 3, 11.)

A.      **Conflict with the DOT**

Plaintiff argues that the ALJ erred when he failed to ask the VE if her testimony was consistent with the DOT.  (*Id*. at 11-12.)

To be considered disabled, a claimant must have a severe impairment that makes her unable to perform her previous work or any other substantial gainful activity existing in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. § 404.1505(a).  According to the Code of Federal Regulations, "[w]ork exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements [that a claimant is] able to meet with [her] physical or mental abilities and vocational qualifications."  20 C.F.R. § 404.1566(b).  It is the Commissioner's burden at step five to show that a claimant is capable of performing other gainful employment in the national economy.  20 C.F.R. § 404.1520(a)(4)(i); *Greenspan*, 38 F.3d at 236.  Once the Commissioner finds that jobs in the national economy are available to a claimant, the burden of proof shifts back to the claimant to rebut this finding.  *See Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990) (citing *Fraga*, 810 F.2d at 1302).

The Commissioner may consult several different sources of evidence, including vocational experts and the DOT,[2] to determine when presumptively-disabled claimants can perform alternative and available work.  *See Veal v. Soc. Sec. Admin.*, 618 F. Supp. 2d 600, 608 (E.D. Tex. 2009).  Vocational experts assess whether jobs exist for a person with the claimant's precise abilities and help to determine complex issues, such as whether a claimant's work skills can be used in other

---

[2] The DOT and its supplement, Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles (SCO), comprise a comprehensive listing of job titles in the United States, along with detailed descriptions of requirements for each job, including assessments of exertional levels and reasoning abilities necessary for satisfactory performance of those jobs.  The Commissioner recognizes the DOT/SCO publications as authoritative, and routinely relies on them "for information about the requirements of work in the national economy."  Soc. Sec. R. 00–4p, 2000 WL 1898704, at *2 (Dec. 4, 2000).

work, and the specific occupations in which they can be used. *See* 20 C.F.R. §§ 404.1566(e), 416.966(e). The ALJ may further rely on the testimony of a VE in response to a hypothetical question[3] or other similar evidence. *Newton*, 209 F.3d at 458; *Bowling*, 36 F.3d at 435. Social Security Ruling 00–4p requires that prior to relying upon evidence from a VE to support a determination of disability, the ALJ must identify and obtain a reasonable explanation for any apparent conflicts between occupational evidence provided by a VE and information in the DOT. *See* SSR 00-4p, 2000 WL 1898704, at *1–2. As part of his duty to fully develop the record, the ALJ has an "affirmative responsibility" to inquire of the VE on the record whether or not there is such an inconsistency. *Id*. at 4; *see Graves v. Colvin*, 837 F.3d 589, 592 (5th Cir. 2016) (citations omitted).

Here, the ALJ determined that Plaintiff had the RFC to perform less than the full range of light work as defined in 20 C.F.R. § 416.967(b), and relying exclusively on the VE's testimony, found at step five that Plaintiff was "capable of making a successful adjustment to other work that exist[ed] in significant numbers in the national economy," including jobs like price tagger, office cleaner, and assembler. (doc. 12-1 at 27-28, 32-33.) The ALJ failed to inquire on the record at the administrative hearing as to whether the VE's testimony was consistent or conflicted with the DOT, however.[4] (*See id*. at 55-57.) This was error. *See Graves*, 837 F.3d at 592 (holding that it is error

---

[3] "The ALJ relies on VE testimony in response to a hypothetical question because the VE 'is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed.'" *Benton ex rel. Benton v. Astrue*, 3:12-CV-874-D, 2012 WL 5451819, at *7 (N.D. Tex. Nov. 8, 2012) (quoting *Carey v. Apfel*, 230 F.3d 131, 145 (5th Cir. 2000)). A hypothetical question posed by an ALJ to a VE must reasonably incorporate all the claimant's disabilities recognized by the ALJ and the claimant must be afforded a fair opportunity to correct any deficiencies in the hypothetical question. *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).

[4] In his written decision, the ALJ concluded that "the vocational expert's testimony [was] consistent with the information contained in the *Dictionary of Occupational Titles*." (doc. 12-1 at 33.) This finding is insufficient because "[t]here is no provision in SSR 00–4p for the ALJ to determine on his own if there is a discrepancy between the VE's testimony and the DOT; the ALJ must elicit the information from the VE on the record." *Jones v. Colvin*, No. 3:11-CV-2818-BH, 2013 WL 1285486, at *21 (N.D. Tex. Mar. 29, 2013) (citing SSR 00–4p, 2000 WL 1898704, at *2).

when "the ALJ [does] not ask whether [the VE's] testimony was consistent with the DOT" even if "the vocational expert cite[s] the DOT in her testimony").[5]

**B.      Harmless Error**

Plaintiff argues that she was prejudiced by the ALJ's "failure to inquire at the administrative hearing whether there was a conflict between the VE's testimony and the DOT . . . ." (doc. 17 at 12-14.)

The Fifth Circuit has held that "[p]rocedural perfection in administrative proceedings is not required" and a court "will not vacate a judgment unless the substantial rights of a party are affected." *Mays v. Bowen*, 837 F.2d 1362, 1363–64 (5th Cir. 1988). "[E]rrors are considered prejudicial when they cast doubt onto the existence of substantial evidence in support of the ALJ's decision." *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988). In the Fifth Circuit, harmless error exists when it is inconceivable that a different administrative conclusion would have been reached absent the error. *Bornette v. Barnhart*, 466 F. Supp. 2d 811 (E.D. Tex. Nov. 28, 2006) (citing *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003)). Accordingly, to establish prejudice that warrants remand, Plaintiff must show that the VE's testimony was "actually inconsistent with the DOT" and could have resulted in a different decision. *See Graves*, 837 F.3d at 592–93 (applying a harmless-error standard when the ALJ erred by failing to ask the VE if her testimony was consistent with the DOT).

Plaintiff contends that the jobs of price tagger, office cleaner, and assembler are performed

---

[5] The Commissioner relies on *Carey v. Apfel*, 230 F.3d 131 (5th Cir. 2000), to argue that the ALJ properly relied on the VE's testimony because it provided additional guidance beyond the information contained in the DOT. (doc. 18 at 3.) In *Carey*, however, the Fifth Circuit expressed an unwillingness to defer to a VE without explanation, and determined that "neither the DOT nor the [VE] testimony is per se controlling." 230 F.3d at 147. The ALJ did not explain why he deferred to the VE or ask if her testimony was consistent with the DOT, which, as noted, was error. *See Graves*, 837 F.3d at 592.

at the light exertional level, which requires "standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." (doc. 17 at 13.) She argues that "[a] limitation to only 2 hours standing and/or walking during an 8-hour workday is a direct conflict with how the jobs identified by the VE are defined as being performed in the DOT." (*Id.*)

During the administrative hearing, the ALJ questioned the VE about a hypothetical individual who had several limitations, including that she could stand and walk for 2 hours out of an 8-hour workday. (doc. 12-1 at 56.) In response, the VE testified that despite the limitations, the hypothetical individual could perform the job requirements necessary for a price tagger, office cleaner, and assembler. (*Id.*) The ALJ incorporated this limitation into Plaintiff's RFC by limiting her "to standing/walking for a total of 2/8 hours in a total workday." (*Id*. at 27-28.) The ALJ relied upon the VE's testimony at step five to find that Plaintiff was not disabled and could perform all requirements necessary for the jobs of price tagger, office cleaner, and assembler. (*Id*. at 33.)

Plaintiff argues that the limitation for standing and/or walking for 2 hours out of an 8-hour workday "clearly precludes the jobs identified by the VE in response to the ALJ's third hypothetical question." (doc. 17 at 13.) She also argues that the ALJ's first hypothetical to the VE was supported by the record and demonstrated that there was no other work she could perform. (*Id*. at 14.) Plaintiff fails to identify any evidence showing that the limitation of standing and/or walking 2 hours out of an 8-hour workday would preclude her from performing the identified jobs, however, and none of the identified job descriptions in the DOT directly conflict with the VE's testimony based upon Plaintiff's assigned RFC. *See Perez*, 415 F.3d at 464 ("where the claimant offers no evidence contrary to the VE's testimony, the claimant fails to meet his burden of proof under the fifth step of the disability analysis"); *see also Jones v. Astrue*, 691 F.3d 730, 734-35 (5th Cir. 2012) ("The party seeking to overturn the Commissioner's decision has the burden to show that prejudice resulted from

an error ... [a] mere allegation that additional beneficial evidence might have been gathered had the error not occurred is insufficient to meet this burden.").

Plaintiff has not shown an inconsistency between the VE's testimony and the DOT and therefore has failed to establish prejudice from the ALJ's failure to comply with SSR 00-4p.[6] The ALJ's error was harmless and does not warrant remand. *See Wade v. Berryhill*, No. 3:16-CV-1362-BH, 2017 WL 4176940, at *11 (N.D. Tex. Sept. 21, 2017) (finding that the ALJ's error in failing to ask if the VE's testimony was consistent with the DOT was harmless).[7]

### IV. CONCLUSION

The Commissioner's decision is **AFFIRMED**.

**SO ORDERED**, on this 6th day of March, 2019.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

---

[6] Even assuming the existence of a conflict between the DOT and the VE's testimony, such a conflict would not be direct or obvious, and would instead be an implied or indirect conflict. *See Ceballos v. Colvin*, No. EP-13-CV-381-ATB, 2015 WL 474367, at *5 (W.D. Tex. Feb. 3, 2015) (determining that the plaintiff's "argument relate[d] to an implied conflict between the VE's testimony and the DOT" because nothing in the DOT's job descriptions for the jobs identified by the VE "indicate[d] that six hours of standing and/or walking [were] required to perform the job[s]."); *Zapata v. Colvin*, No. 4:13-CV-340-Y, 2014 WL 4354243, at *11 (N.D. Tex. Sept. 2, 2014) (noting the difference between direct and implied conflicts with a VE's testimony). Plaintiff did not identify any conflict at the administrative hearing, and "[t]he Fifth Circuit has held that claimants should not be permitted to scan the record for implied or unexplained conflicts between the specific testimony of an expert witness and the voluminous provisions of the DOT, and then present the conflict as reversible error when the conflict was not deemed sufficient to merit adversarial development in the administrative hearing." *Zapata*, 2014 WL 4354243, at *11 (citing *Carey*, 230 F.3d at 142); *see also Ruffin v. Colvin*, No. 3:16cv18-DPJ-FKB, 2017 WL 536549, at *6 (S.D. Miss. Feb. 8, 2017) (finding that an "unexplained" conflict did not require remand because the plaintiff "failed to raise it before the hearing officer.").

[7] Although Plaintiff also appears to argue that the ALJ did not properly evaluate Dr. Horton's medical opinion, she did not expressly raise any issue regarding medical opinion evidence, as required by the scheduling order. (*See* doc. 17 at 16-17; doc. 13 at 2.) Even if the issue had been properly raised, however, it would not provide a basis for remand because the ALJ specifically discussed Dr. Horton's report and relied on other medical opinions and medical evidence of record in determining that Plaintiff could perform other work. (*See* doc. 12-1 at 31-33.)